F I L E D
**United States Court of Appeals**
**Tenth Circuit**

**FEB 7 2003**

**PATRICK FISHER**
**Clerk**

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

STEPHEN JOE HOOVER,

      Plaintiff - Appellant,

v.

FRANK KEATING, Governor;
BEVERLY YOUNG, Board of
Corrections Employee; MICHAEL
ROARK; DAVID HENNEKE; JAMES
BOYKIN; HUGH REED; RANDY
WRIGHT; ROBERT RAINEY, Board
of Corrections Members; DEBBIE
MAHAFFEY, Warden for Oklahoma
Department of Corrections; SHAWN
PRICE; JOEL SUTTON; STEVE
BEARS, Captains for Oklahoma
Department of Corrections; RANDY
COOK, Deputy Warden of Oklahoma
Department of Corrections; MIKE
JACKSON, Physician for Oklahoma
Department of Corrections,

      Defendants - Appellees.

No. 02-5136
No. 01-CV-281-B(J)
(N.D. Oklahoma)

---

## ORDER AND JUDGMENT [*]

---

[*] The case is unanimously ordered submitted without oral argument pursuant to Fed. R. App. P. 34(a)(2) and 10th Cir. R. 34.1(G). This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Before **EBEL** , **LUCERO** , and **O'BRIEN** , Circuit Judges.

Stephen J. Hoover, an Oklahoma state prisoner, filed suit against Governor Frank Keating; Board of Corrections employee Beverly Young; Board of Corrections members Michael Roark, David Henneke, James Boykin, Hugh Reed, Randy Wright and Robert Rainey; Warden Debbie Mahaffey; Captains Shawn Price, Joel Sutton and Steve Bears; Deputy Warden Randy Cook; and Physician for the Oklahoma Department of Corrections Mike Jackson, alleging violations of the Americans with Disabilities Act, 42 U.S.C. § 12132, and the Eighth and Fourteenth Amendments, pursuant to 42 U.S.C. § 1983.  The district court granted summary judgment against Hoover, and Hoover appeals.  Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I

During Hoover's incarceration at the Dick Conner Correction Center ("DCCC"), he received disciplinary citations for disobeying housing assignments on three occasions:  April 18, May 2, and May 16, 2000.  In refusing the housing assignments, Hoover specified that he would not cell with a black inmate.  After hearings held for each incident, Hoover received disciplinary segregation and fines.  Hoover appealed each time, arguing that the cell assignments constituted a danger to him.  He argued that the placement of black inmates with white inmates

-2-

could result in a prison riot. At no time, however, did Hoover provide any details regarding his prospective cell mates, nor did he identify specific facts that supported his allegations. Consequently, each of his appeals was denied by both Warden Mahaffey and Director/Designee Guilfoyle.

In connection with these incidents, Hoover also filed grievance reports on April 28 and May 16, requesting dismissal of the misconduct citations and other relief. He reiterated his assertions that the cell assignments constituted a danger to him and suggested that any policy that placed black inmates with white inmates was dangerous. In denying relief on May 9 and June 2, Warden Mahaffey pointed out that Hoover failed to provide any documentable evidence of security concerns to justify his refusal to cell with a particular inmate, noted that race would, under no circumstances, be used as the basis for making housing assignments, and explained that misconduct citations were not grievable.

On June 16, Hoover appealed his grievance to Director/Designee Guilfoyle. In this appeal, Hoover abandoned the argument that interracial housing assignments posed a danger to his safety and instead claimed that his refusal to change cells was based on a medical condition under which he could occupy lower bunks only. [1] Based on this medical condition, he argued that he should not

---

[1] In his brief, Hoover attaches a statement suggesting that he raised the disability claim earlier than June 16. This statement, dated June 9 and received in
(continued...)

have been placed in random housing and that the documented evidence of his condition warranted reversal of his disciplinary citations. In attempting to explain why this evidence was not previously submitted, Hoover argued that although the medical condition was noted on his medical jacket on April 5, 2000, he was not aware of this at the time he was assigned to a random cell on May 2. On June 22, Director/Designee Guilfoyle denied the appeal on the ground that misconduct citations are not grievable. On May 10, Hoover was transferred to the Supermax H-Unit at the Oklahoma State Penitentiary in McAlester, presumably due to his continued refusal to comply with housing assignments.

Based on these incidents, Hoover filed suit under 42 U.S.C. § 1983, alleging violations of his rights under the Eighth and Fourteenth Amendments, and under 42 U.S.C. § 12132, alleging violations of his rights under the Americans with Disabilities Act. The district court granted summary judgment to the defendants, finding that the undisputed facts provided no basis for Hoover's claims. Hoover v. Keating, No. 01-CV-281-B(J) (N. D. Okla. Jul. 29, 2002).

---

[1](...continued)
the Administrative Review office on June 15, expresses Hoover's intent to appeal. (Appellant's Br., Att. A, p.3.) It remains unclear whether this document sought to appeal the denial of Hoover's grievance, or to appeal the affirmation of one of his misconduct citations. Even if we credit the reliability of the document, which does not appear in the record, it shows only that the defendants had notice of Hoover's disability as early as June 9.

## II

We review the district court's grant of summary judgment de novo. <u>Wolf v. Prudential Ins. Co.</u>, 50 F.3d 793, 796 (10th Cir. 1995). Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. <u>Id.</u> Because Mr. Hoover proceeds pro se, we must liberally construe his pleadings. <u>McBride v. Deer</u>, 240 F.3d 1287, 1289 (10th Cir. 2001).

## A

Hoover argues that his refusals to obey housing orders were justified by his medical condition and that the issuance of misconduct citations on the basis of these refusals violated his rights under the Americans with Disabilities Act ("ADA"). Title II of the ADA provides:

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132. In support of his claim, Hoover points to his Health Summary, signed by Dr. Mike Jackson on April 5, 2000, recommending Hoover be assigned to a lower bunk only. Hoover cites no evidence, however, suggesting that defendants' conduct in imposing the housing assignment or in disciplining

-5-

him for his disobedience to orders was motivated by this alleged disability. In fact, it was not until after these incidents occurred that Hoover learned about the Health Summary recommendation and brought it to defendants' attention. Although the recommendation appeared in Hoover's medical jacket as early as April 5, we are reluctant to conclude defendants had knowledge of it until Hoover brought it to their attention. Hoover presents no evidence that the defendants had reason to know about his disability, much less that their conduct was motivated "by reason of [his] disability." Rather, the evidence indicates that Hoover's refusal to obey orders was based on the race of his newly assigned cell mate, and that he provided no evidence that this constituted a specific security risk to him. Under prison policy, race does not justify a refusal to obey housing assignments, see Inmate Housing Policy, D.O.C. OP-030102, Pt. I (B) ("Under no circumstances will race, color, or ethnic origin be the sole basis for making housing assignments."), and any refusals based on alleged security risks must be supported by documented evidence, id. at Pt. V (A) ("If an inmate refuses a housing/cell assignment for no documentable reason of safety, security or health . . . an offense report may be prepared."). Consequently, defendants' decision to discipline Hoover for his conduct was proper and did not violate the ADA.

**B**

In addition to the ADA claim, Hoover presents several due process claims. First, he argues that defendants' failure to review his housing assignment, in alleged violation of Department of Corrections policy, deprived him of due process. The policy he cites states: "Circumstances which <u>may</u> warrant a review of housing assignment status <u>may</u> include, but not be limited to, the following: . . . (b) An inmate is convicted of a disciplinary offense that through investigation is determined to be racially motivated." D.O.C. OP-030102, Pt. IV (A)(1)(b) (emphasis added). Even if this court concluded that a prison's violation of its own stated policies and procedures violates due process, an issue we need not reach here, the permissive language of the cited provision demonstrates that housing assignment reviews are not guaranteed. Consequently, there is no basis for Hoover's contention that the defendants' failure to review the housing assignment constituted a due process violation.

Second, Hoover argues that his assignment to random housing rather than restrictive housing, in alleged violation of prison policies, deprived him of due process. The Department of Corrections Policy states: "An inmate must accept a housing assignment unless it is determined that documentable safety, security or health condition [sic] exists." <u>Id.</u> at Pt. V (B)(2). In his grievance appeal dated June 16, he cited this provision and underlined "documentable" and "health."

Presumably, he interprets this provision to justify his conduct on the three occasions, and consequently, to prohibit prison administrators from disciplining this conduct. Nevertheless, even if we agreed that this provision affirmatively permits inmates to refuse housing assignments on the basis of a health condition and prohibits prison administrators from punishing inmates for such refusals, this argument would not assist Hoover. As discussed earlier, the evidence shows that his refusals were motivated not by his health condition, but rather by his dislike for his cell mates. Moreover, even if his refusals were motivated by his health condition requiring a bottom bunk, there is no evidence that the housing assignments required him to occupy a top bunk on any of the three occasions. Consequently, Hoover's conduct was not justified, and the defendants acted properly in disciplining him.

Third, Hoover argues that the disciplinary proceedings violated his procedural due process rights. Under Mitchell v. Maynard, 80 F.3d 1433, 1445 (10th Cir. 1996), we held that prison disciplinary proceedings satisfy procedural due process requirements as long as advance written notice of the charges are provided, the inmate is given an opportunity to call witnesses and present evidence, and a written statement of the evidence relied on and the reasons for the disciplinary action are provided. Hoover received advanced written notice of each of the disciplinary charges, an opportunity to call witnesses and present

documentary evidence in his defense, and a written statement explaining the decisions. Consequently, the requirements of procedural due process have been satisfied and we affirm the district court's dismissal of Hoover's due process claims.

## C

Finally, Hoover alleges that the defendants' actions constituted cruel and unusual punishment in violation of the Eighth Amendment. In Farmer v. Brennan, 511 U.S. 825, 834 (1994), the Supreme Court articulated the standard for determining when prison conditions constitute cruel and unusual punishment in violation of the Eighth Amendment:

> First, the deprivation alleged must be, objectively, sufficiently serious; a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities. . . . The second requirement follows from the principle that only the unnecessary and wanton infliction of pain implicates the Eighth Amendment. To violate the Cruel and Unusual Punishments Clause, a prison official must have a sufficiently culpable state of mind. In prison-conditions cases that state of mind is one of deliberate indifference to inmate health of safety.

Id. (quotation omitted). Hoover's Eighth Amendment charge, liberally construed, may be interpreted to challenge three actions by the prison administrators: (1) the insistence that he accept the housing assignment notwithstanding his health condition; (2) the insistence that he accept the housing assignment

-9-

notwithstanding the potential danger posed by the prospective cell mate; and (3) the order to transfer Hoover to the higher security prison.

As to the first allegation, even if we accepted the proposition that housing assignments that ignore an inmate's health condition constitute sufficiently serious deprivations, Hoover has presented no evidence that the defendants possessed the requisite state of mind of deliberate indifference. The facts do not indicate that the defendants were aware of Hoover's health condition until he brought it to their attention well after the housing assignments were imposed. Therefore, he cannot show that defendants acted with a deliberate indifference to his health.

As to the second allegation, Hoover presents no evidence suggesting that placing him with the prospective cell mates posed a substantial risk of serious harm. Even if each placement posed a security risk, Hoover presents no evidence that the defendants were aware of any such risk beyond Hoover's broad assertions that a "prison riot" could ensue if inmates of different races continued to be celled together, and he offers no evidence that defendants were deliberately indifferent to such a risk.

Hoover's third challenge—that his removal to a higher security prison violated his Eighth Amendment rights—may be better understood as a due process claim, because there is no ground to assert that the transfer constituted a serious

deprivation or that it occurred with deliberate indifference to Hoover's safety.

Nevertheless, even under a due-process-clause analysis, this claim must fail.

Under Olim v. Wakinekona, 461 U.S. 238, 245 (1983), an inmate has no

justifiable expectation that he will be incarcerated in any particular prison. In

Meachum v. Fano, 427 U.S. 215, 224–25 (1976), the Supreme Court stated:

> The Constitution . . . does [not] guarantee that a convicted prisoner will be placed in any particular prison . . . . The conviction has sufficiently extinguished the defendant's liberty interest to empower the State to confine him in Any Of [sic] its prisons. . . . That life in one prison is much more disagreeable than in another does not in itself signify that a Fourteenth Amendment liberty interest is implicated when a prisoner is transferred to the institution with the more severe rules.

Id. Thus, Hoover's transfer does not raise a due process concern.

### III

Because we conclude that defendants did not violate Hoover's rights, we do

not address defendants' claims of immunity. The judgment of the district court is

AFFIRMED.

The mandate shall issue forthwith.

ENTERED FOR THE COURT


Carlos F. Lucero
Circuit Judge

-11-